Demo, J.
 

 The plaintiff’s counsel maintain that there should have been a recovery in the Supreme Court upon two grounds: first, because the corporation was not liable to taxation on personal property at Oswego, but could only be assessed at Auburn; and, secondly, that it was improperly assessed the sum of $217,500 beyond the anfount of its capital, after deducting the value of its real estate; whereas, as they insist, it was only liable to taxation on the nominal amount of its capital over and above the deductions for real estate. A question has been made, whether the defendants were liable to this action for their acts as assessors, assuming that the plaintiffs are right in their positions above mentioned; but the .conclusions at which we have arrived render it unnecessary to express an opinion upon this last point.
 

 1. We think the corporation was legally assessed and taxed, at Oswego. The act authorizing the creation of corporations for manufacturing purposes (Laws 1848, ch. 40), requires that the certificate of incorporation should state (among other particulars), “ the names of the town and county in- which the operations of the company are to be carried onand the certificate under which the plaintiff’s corporation was formed, accordingly declares that the operations of that company shall be carried on at the city of Oswego, in the county of Oswego'; and it appears that the plaintiff in fact erected the manufactory there, and that- all the- business of manufacturing was carried .on in that city. A portion of the books were kept at the treasurer’s office at Auburn, and the general financial affairs were transacted there. If our judgment depended upon the relative proportion of the pecuniary business which was managed at- one or the other of the two localities, it would be
 
 *452
 
 necessary to examine more critically the several particular facts found by the referee in order to ascertain whether they warrant his general conclusion, that the place for transacting the financial concerns and the principal office of the company was at Oswego; but being of opinion that the plaintiff could not, within the sense of the provision of the Revised Statutes to be presently mentioned, have any principal office for transacting its financial concerns except at Oswego, we do not pass any .judgment upon the question of fact referred to.
 

 The Revised Statutes contain the following provision as to the place of taxing the property of corporations: “ The real estate of all incorporated companies, liable to taxation, shall be assessed in the town or ward in which the same shall lie, in the same manner as the real estate of individuals. All the personal estate of every incorporated company, liable to assessment on its capital, shall be assessed in the town or ward wherq the principal office of place for transacting the financial concerns of the company shall be; but if such company have no principal office or place for" transacting. its financial concerns, then in the town or ward where the operations of such company shall he carried on.” (1 R. S., 389, § 6.) This provision applied to all incorporations liable to taxation on their capital then existing, and to all such as should thereafter come into existence, whether their charters, or the certificates under which they were incorporated, when formed under general acts, confined them to any locality or not. The greater number of them were incorporated for carrying on some financial or industrial enterprise in some particular city or town, and this circumstance of locality was a part of their legal constitution; but a great many were of a character which did not permit them to be confined to any one local division of the State., ¡Navigation companies, turnpike companies, and canal companies, were of this class, and also bridge companies spanning rivers dividing separate local jurisdictions, and some others whose business was of a general nature. In the aggregate, these corporations, unattached to any particular town or city, were very numerous. Without some special provision to meet the case, it would be
 
 *453
 
 impossible to determine in what place they were to be assessed in their capital; but as all property of joint stock corporations was to be taxed somewhere, there would be great uncertainty as to the place of taxation in such cases, and they might be assessed in the several towns or cities through which their operations extended; and this would be likely to produce a conflict among the different jurisdictions, and- to cause much inconvenience to the companies, as well as to the public. It was to remedy this inconvenience, that me provision under consideration was enacted. It was not necessary to limit it, in terms, to those companies having no seat in a particular town or city, for it was assumed that the other class of corporations, namely, those having a fixed residence, would probably have a principal office for conducting their financial business in the town where they were located; and if they did not, the .general language at the close of the section would meet their case. The. plaintiff’s position would require us to hold that a bank or insurance company, chartered to carry on its business in a particular town, for instance in the city of Hew York, could lawfully establish its financial office in some neighboring town— suppose in the county of Westchester—and in that manner remove its residence, as regards its liability to contribute to the public burdens, to that suburban jurisdiction and deprive the municipality, of whose local administration it enjoyed the benefit, of any contribution towards the expenses of the local government. We are of opinion that when the legislature, by the act of incorporation, or the associates, by their certificate or articles executed pursuant to a general law, have attached the corporate body to a particular local division of the State, whether it be a city, town, or entire county, it cannot establish such a principal office as is intended by the provision of the Revised Statutes, which has been quoted, out of such ci ty, town-oy county.
 

 The general statute, authorizing the formation of corporations of the character of the plaintiff in this action, did not contemplate the creation of companies having no specific location in some town or city. The statement which was required
 
 *454
 
 to be contained in the certificate, and which was actually inserted in the certificate under which this corporation was organized, was intended to serve the same purpose as the' declaration usually contained in special acts of incorporation, in which it was stated that the business was to be carried on in a particular town or city. The location established by the certificate could not be changed at the pleasure of the directors or trustees, any more than the corporate name, the period of existence, or the objects for which the company was formed or . the amount of its capital stock. All these particulars, required to be stated in the certificate, became portions of the legal constitution of the corporation. Some of them, as the kind of manufacturing, and the amount of the capital,- might be changed by a vote of the stockholders (§§ 21, 22); but there does not appear to be any power, short of the legislature, which would enable them to alter the seat of the corporation. It is not intended to state that every corporate act must necessarily be transacted in the particular locality. On the contrary, such businesses the exigency oí' its affairs requires to be transacted in other parts of the State, or out of the State, may be so transacted; but, under this general power, it could not change its residence by establishing its principal, office in another place.
 

 The Western Transportation Company, respecting which a question lately came before us, as to the place where it was to-be taxed, was formed under a general act which provided for the incorporation of navigation companies. That' species of ' business could not generally be carried on in a single' local jurisdiction, and, hence, such a company could not be located in any city or town in the manner adopted in respect to manufacturing corporations, by requiring its certificate to state the place where its operations should be carried on. If no statement of any locality had been required, the provisions of the Revised Statutes would have applied to the case, and the assessors would have been obliged to inquire where, in point of fact, its principal financial office had been established. To avoid the necessity of such an inquiry, which might have been
 
 *455
 
 attended with difficulty in some cases, the act required the certificate to state “the name of the city .or town and county in which the principal office'for managing the affairs” of the company should be situated (Laws of 1854, p. 518); and the certificate for the formation of the Western Transportation • Company located the office at Tonawanda. We held that the company could be taxed on its capital only in that town.
 
 (Western Trans. Co.
 
 v.
 
 Sheu,
 
 19 N. Y., 408.) So far from this being an authority in favor of the position of the plaintiff, as is claimed, we think it shows the correctness of .the judgment of the Supreme Court in the present case. In both these general acts, the legislature undertook to provide for the locating the residence of the companies in some particular city or town, in order to provide against the uncertainty which might arise from its being left to be ascertained as an open question of fact, respecting which conflicting judgments might be formed. As a single place could easily be assigned to a manufacturing corporation, the certificate to create such companies was required to state the town or county where its operations should be carried on; but, as the operations of a navigation company were not generally local, the associates in those companies were compelled to designate, and state in the certificate, the locality of their principal office for managing their affairs. In either case, the city or town fixed upon and duly stated in the certificate became the legal residence of the company, and the place where it was to be taxed for personal property; and it cannot be changed by establishing an office or transacting any portion of their business elsewhere. This is, substantially, the point decided in the case referred to.
 

 2. We are next to determine whether the plaintiff could be legally assessed for a greater amount than the nominal capital after making a deduction for its real estate. The assessors considered the stock to be worth a premium of seventy-five per cent on its par value, and assessed the plaintiff accordingly. The authority for this, if it exists, is found in the laws of 1857 (ch. 456, §8). The section is as follows: “The capital stock of every company liable to taxation, except such part of it as
 
 *456
 
 shall have been excepted in the assessment roll, or shall have been exempted by law, together with its surplus profits or. reserved funds, exceeding ten per cent of its capital, after deducting the assessed value of its real estate, and all shares of stock in other corporations actually owned by such company, which are taxable upon their capital stock under the laws of this State,
 
 shall he assessed at its actual value,
 
 and taxed in the same - manner as the other real and personal estate of the county.”
 

 The term, “ actual value,” is evidently used in distinction to the nominal value or amount. The direction to assess it at the actual value, therefore, required that it should be estimated above or below the par amount, according to the fact, and as the particular case might require. This is the natural meaning .of the language employed, and the interpretation it should receive, unless there is something in the other statutes relating to the taxation of.corporations which satisfactorily shows that it was used in another sense. All the laws upon this subject are in
 
 pari materia ;
 
 and it is quite legitimate to claim an examination. of them to ascertain the bearing and intention of a particular provision in any one of them.
 

 By the Eevisgd Statutes, corporations deriving an income from their capital or business, with exceptions to be afterwards mentioned, were taxable for the amount of their capital, not invested in real estate, as so much personal property, without regard to its market or productive value or the consideration whether it had been increased by the accumulation of a surplus or diminished by losses or otherwise. (1 R. S., 414, §§ 1, 2, 6;
 
 The Bank of Utica
 
 v.
 
 The City of Utica,
 
 4 Paige, 399.) Manufacturing and turnpike corporations were to be assessed on a different principle, namely, on the “ cash value of the stock,” after the same deduction for real estate purchased as in the above case; which value, the act declares, is “ to be ascertained by the assessors by the sales of the stock or in any other manner.” (§ 7.) If the valuation should be considered by a taxpayer as too high, the right was given in the next section to have it reduced to the sum which should be sworn to in an affidavit to be made by a proper officer of the company. We •
 
 *457
 
 have here presented two distinct principles of taxation, applied to different kinds of corporations, the discrimination being doubtless based upon some public motive. There was another discrimination, founded upon the different purposes for which the corporations were formed. Any company might be wholly exempt from taxation by showing, by the affidavit of one of its officers, that it was not in the receipt of any income or profits (§9); but, in addition to this privilege, common to all the corporations, manufacturing and marine insurance companies were allowed 'to commute by paying five per cent on the amount of their profits; if the whole, profits did not exceed five per cent on their capital (§ 11); and turnpike, bridge and canal companies were to be wholly exempt, unless their incomes . exceeded five per cent on their capital. (§ 12.)
 

 In 1853, the foregoing arrangement was changed in several important particulars. In the first place, the total exemption of companies which could show that they had not received any profits was abolished. Then the discrimination between the different kinds of corporations, founded on the nature of their business, was abandoned, and all were to be taxed upon a single principle; and that principle was, to assess them for the amount of their capital, with the usual deduction for the portion invested in real estate, and, in addition, for the amount of their “surplus profits or reserved funds.” But, instead of the total exemption in terms extended to companies which did not make profits, all the taxable corporations were allowed to commute by paying five per cent on their profits when these did not exceed five per cent on the capital; adopting, in that respect, the provision which the Revised Statutes had applied to manufacturing. and marine insurance companies. (Laws 1853, ch. 654.)
 

 This system continued until the passage of the act of 1857, containing the section under immediate consideration. By this last mentioned act, the principle of commutation is definitively abandoned; and the idea of total exemption having been given up in 1853, it seemed necessary, in the opinion of the'legislature, .to establish some other system by which investments in
 
 *458
 
 corporations which should prove unprofitable should not be taxed by the same rule which was applied to those which were productive of large gains. The unyielding rule of assessing the par amount of the stock was unsatisfactory, because it made no allowance for unfortunate investments, nor for losses of capital, on the one hand, or for surplus profits, or the advantage of a lucrative business, on the other. The plan fixed upon was the same which had been applied to manufacturing and turnpike companies, by the 7th section of the title of the Revised Statutes which has been referred to.. The stock was to be assessed at its actual value. The language of the 7th section is, cash value; but we cannot suppose that any change was intended by the slight difference of phraseology. The Revised Statutes suggested that this value was to be arrived at by the sales of stock, or in some other manner; while the act of 1857 is silent as to the means which the assessors are to take to determine the value. The plaintiffs do not claim that the words, “ actual value,” mean the same thing as the par or nominal value; and it seems to me perfectly plain that they were used in opposition to that idea. There is nothing else which they can mean, except the real business valuation, which is precisely the same thing as the market price; and this was, undoubtedly, what the legislature had in view. But as the market price of a particular stock is sometimes above par, as it is also often below, the legislature, by adopting that measure of value, must have intended to subject the fortunate holders of a profitable stock to a proportionably high assessment towards the public burdens; while they, at the same time, exempted, in the same proportion, those who had an unprofitable stock. It is obvious that this principle is not precisely so applied to individuals, who are generally obliged to pay the same taxes upon the positive amount of their property, whether it is profitably or unprofitably employed, or remains idle. But there is a just motive for this discrimination, though it is not at first apparent; for one who invests money in a corporate enterprise ceases to own it, and the resulting estate, which he receives in the form of corporate stock, is, for all the ordinary
 
 *459
 
 business purposes for which property is uséd, of a value equal to the market price, and no less or more. But, however this may be on principle, the practice of discriminating between money invested in corporate stock and that which remains under the control of the proprietor, has prevailed from the time that stocks were first subjected to taxation.
 

 The plaintiff’s position is, that the act of 1857 provides for a reduction of the assessment of corporations where the stock is not of the value of the money which it represents, but not for an increase where it is of greater value. This is argued to follow from the consideration that the provisions in the Revised Statutes and in the act of 1853, for an exemption from taxation in the case of profitless corporation's, and for a reduced rate of taxation by means of commutation where the profits were small, looked solely to the relief of these institutions, and never to the charging them with increased burdens. It is conceded that, both by the act of 1853' and that- of 1857, the surplus profits accumulated and not divided are to be taxed
 
 eo nomine,
 
 and this, it is argued, is -the only way in which corporations can be assessed for a greater amount than the nominal capital. But the present case shows that a corporate enterprise may be so happily chosen, or so skillfully conducted, as to render the stock of much greater value than the money invested. We think the legislature have very plainly expressed their will, that where such is the case, such companies must contribute towards the public charges according to the measure of their good fortune, or, in other words, to the value of their stock. There is, doubtless, an incongruity in including the accumulated profits above ten per cent in the assessment, where the. capital is assessed at its market value. It does not seem to have occurred to the law-makers that the existence of a surplus enters into- the market value of the stock, and that this surplus is never the subject of an ownership or disposition distinct from the stock, and that their whole object was accomplished when they directed the stock to be assessed at its actual value. This incongruity does not practically embarrass the present case, as there were no surplus profits in the hands of this corporation;
 
 *460
 
 but the enhanced value of the stock arises wholly out of its ability to make large profits. But in a case where a surplus exists, which must be included in the amount of the assessment, justice will be attained by deducting it's amount from the sum at which the stock would be estimated if the surplus was considered as embraced in the valuation.
 

 A few words seem necessary upon another argument, arising out of the provisions of prior statutes, which has been much .urged by the plaintiff’s counsel. When the exemption from taxation prevailed in the case of an entire absence of profits, and a commutation where the profits were small, the facts were to be arrived at by the affidavits of the parties claiming the exemption, and the practice was the same where individuals claimed that their property was over-valued. (1 R. S., 416, §§ 9, 13;
 
 Id.,
 
 392, § 15.) In the year 1851, this was changed, in respect to individuals, by requiring the applicant for a reduction to submit himself to an examination, after which the assessors were to determine the value according to their judgment upon the facts disclosed (Laws 1851, p. 332); and in 1857, and cotemporaneous with the passage of the section immediately in question, this change was applied to corporations complaining of an over-valuation, by declaring that the term, “persons,” in the act of 1851, should be held to apply to corporations. (Oh. 536.) The result of this is, that where the real estate or the stock of a corporation is claimed to be over valued, the officers can present themselves for examination for the purpose of showing the justice of their claim. The argument deduced from this by the plaintiff’s counsel is, that inasmuch as the claim of an individual who seeks tobe examined under the statute is always for a reduction, and as the assessors have no right to increase the valuation, whatever the effect of his answers may.be, when the same practice of an examination was applied to corporations by the act of 1857 last referred to, the j urisdiction of the assessors, acting on the result of the testimony, must necessarily be the same; that is to say, they may reduce the valuation if the evidence establishes an overvaluation, but they cannot increase it if the tendency of the
 
 *461
 
 evidence should be the other way. We think this argument quite inconclusive. The assessors are to assess the stock, in the first place, at its actual value, according, to their judgment. Then the officers of the company may present themselves for examination, and should their answers disclose that the valuation ought to have been greater, and not less, than the amount set down, it may be that the roll cannot be changed; but this by no means shows that the assessors have not a right, in the first instance, to set down the true value,-though it exceeds the nominal amount, of the stock. It might, with equal force, be argued that, because the assessment of an individual cannot be increased upon a review of the roll whatever may be shown by the examination of the tax-payer, the assessors ought not, in the first instance, to assess it at what they conceive to be its actual value.
 

 In the last place, it is said that the act of 1853 prescribes the form- of the assessment roll, and directs, among other things, that the amount of the- capital stock of a corporation, paid or secured to be paid, shall be set down in one of the columns of the roll (Laws, p. 1240, § 1), and that this is not changed by the act of 1857. That act, it is true, does not go into detail as to the' form of the roll; but if the intent be clear, as we think it is, to assess the capital at its real, as distinguished from its nominal value, the form can easily be accommodated to give effect to the intention. Such a reconciling construction is often required to be given to remedial and administrative statutes, which are sometimes drawn up in haste, and without prescribing the manner in which the directions of the legislature are to be carried out.
 

 It is objected, on the part of the plaintiff, that the assessment for personal property was added to the roll after the time when, by the statute, it should have been completed, and that, therefore, the addition was unauthorized. But the report of the referee does not sustain this objection. The statement is explicit, that the notice required by law was given on the 1st day of July, and that this was after the rolls had been completed.
 

 
 *462
 
 ‘ \ — . It follows, from these views, that the judgment of the Supreme Court should be affirmed.
 

 All the judges concurring,
 

 Judgment affirmed.